Filed 5/29/25  Quality Aggregates v. Riverside Mining Limited CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| QUALITY AGGREGATES,<br><br>    Plaintiff, Cross-Defendant, and Appellant,<br><br>    v.<br><br>RIVERSIDE MINING LIMITED,<br><br>    Defendant, Cross-Complainant, and Respondent. | D084509<br><br><br><br>(Super. Ct. No. CVRI2301434) |

APPEAL from a judgment of the Superior Court of Riverside County, O.G. Magno, Judge.  Reversed and remanded.

Burton & Swett and Thomas M. Swett, for Plaintiff, Cross-Defendant and Appellant.

Jeffer Mangels Butler & Mitchell, Kerry Shapiro, Susan Allison, and Dan P. Sedor, for Defendant, Cross-Complainant and Respondent.

In 2017, Quality Aggregates (Quality) and Riverside Mining Limited (RML) entered into an operating lease agreement under which Quality was to conduct mining operations on land owned by RML.  In 2019, the parties executed an amendment regarding RML's right to terminate the agreement.

In 2023, after several disputes arose between the parties, RML purported to terminate the agreement under the 2019 amendment.

In the action underlying this appeal, Quality and RML asserted competing claims for declaratory relief regarding their agreement—Quality sought a judicial determination that RML's termination was ineffective, and RML filed a cross-complaint seeking a judicial determination that it had properly terminated the agreement. In an order granting summary judgment in favor of RML, the judicial referee appointed by stipulation to decide the case concluded that RML had met the two express conditions precedent in the amendment that were required to effect termination, and there were no additional conditions precedent to termination elsewhere in the agreement. The referee further found that Quality's affirmative defenses to RML's claim were without merit and RML had therefore properly terminated the agreement. The trial court thus entered judgment in RML's favor.

Quality appeals the judgment. Quality does not dispute that RML satisfied the two express conditions precedent for termination found in the amendment, but it contends the trial court erred in granting summary judgment because there were additional conditions precedent in the original agreement that RML failed to satisfy. Quality further contends it demonstrated triable issues of fact as to its affirmative defenses of condition precedent, setoff, and unclean hands, and judgment should be reversed on that basis as well.

Reviewing the record de novo, we agree with the trial court that RML satisfied the only two conditions precedent required of it to terminate the agreement and that Quality's setoff defense was without merit. We agree with Quality, however, that triable questions of fact remain as to its unclean

2

hands defense.  We therefore reverse the judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Operating Lease Agreement and Amendment*

RML owns certain real property consisting of approximately 158 acres in Riverside County (the Property).  The Property has historically been used for surface mining operations.  In April 2017, Quality entered into an operating lease agreement with RML (the Lease) that provided Quality with "the exclusive and unencumbered right and ability to conduct unimpeded mining operations" on the Property under the permits owned by RML.  The parties agreed, among other things, that in exchange for the right to conduct mining operations, Quality would pay monthly royalty fees to RML.  The term of the Lease was 99 years, but it granted RML the right to terminate the Lease based on certain specified "events of default" by Quality.

In September 2019, the parties executed a First Amendment to Operating Lease Agreement (the Amendment).  The Amendment granted RML the right to terminate the Lease with six months' written notice to Quality and payment of a $2.25 million termination.  The Amendment stated that RML was only entitled to serve a notice of termination if "the following conditions precedent has [*sic*] been met: RM has placed the full amount of the Termination Fee specified in Paragraph 2 of this agreement into a bonded escrow account with instructions providing that the $2,250,000 may not be withdrawn by RM and may be withdrawn by [Quality] as specified in Paragraph 2."  The Amendment further provided that upon delivery of the notice of termination, Quality would have six months to fully vacate the Property.

3

B. *Quality's First Lawsuit Against RML*

In June 2021, Quality filed a lawsuit against RML, alleging that RML breached the Lease and committed various torts by improperly excluding Quality from portions of the Property and leasing those areas to third parties who paid rent to RML (the damages action).  It eventually filed a third amended complaint, alleging claims against RML for breach of contract, trespass to real property, quiet title to real property, assumpsit, declaratory relief, forcible entry, and nuisance.

RML filed a cross-complaint against Quality in the damages action, alleging that Quality breached the Lease and committed various torts in connection with its mining operations at the Property.

C. *RML's Notice of Termination of Lease*

In February 2023, RML sent "unilateral and irrevocable escrow instructions" to its escrow agent, First American Title Insurance Company (FATCO), stating that (1) RML would wire the full $2.25 million termination fee into a FATCO escrow account, and (2) the termination fee may not be withdrawn by RML but may be withdrawn by Quality per the parties' Amendment to the Lease.  RML sent these instructions under an escrow agreement it had entered into with FATCO.  That same day, RML sent Quality via email a written notice of termination of the Lease between itself and Quality, notifying Quality that RML was invoking its right under the Amendment to terminate the agreement and had deposited the $2.25 million termination fee into an irrevocable escrow account with FATCO.

In March 2023, Quality sent a letter to RML stating that it had not complied with the mandatory notice requirements of the Amendment regarding the purported termination.  Two days later, RML sent Quality a

4

second written notice of termination of the Lease, this time via overnight mail and personal delivery.

D. *Quality's Second Lawsuit Against RML*

Also in March 2023, Quality filed its verified complaint against RML for declaratory relief in the action underlying this appeal (the declaratory relief action). Quality alleged that because RML failed to comply with all conditions precedent, RML was not entitled to terminate the Lease. It further alleged that RML improperly excluded Quality from portions of the Property, attempted to arbitrarily charge Quality additional rent for portions of the Property it was entitled to occupy, buried minerals that Quality could have profitably mined, used or leased to others portions of the Property for purposes that impinged upon Quality's leasehold, required Quality to assume direct financial responsibility for the postmining reclamation of the Property, and financed the purported termination consideration with funds essentially stolen from Quality. Quality sought a judicial declaration that RML's attempt to terminate the Lease was ineffective for its failure to comply with all conditions precedent.

RML filed its answer and a cross-complaint for declaratory relief against Quality in May 2023. RML asserted: "This action is a simple dispute over a lessee's wrongful refusal to perform its contractual obligations following its lessor's termination of the parties' operating lease pursuant to a provision that gives the lessor the right, on six months' notice, to terminate the lease at any time and without cause, on only one condition – the lessor's payment into escrow of a $2.25 million dollar termination fee. RML, the lessor, gave [Quality], the lessee, the requisite six months' notice and deposited the termination fee into escrow. In response, [Quality] failed to perform its obligations under the parties' lease, and filed a complaint seeking

5

declaratory judgment from this Court that would erase RML's agreed-upon termination right and rewrite the lease to permit [Quality] to hold over on RML's property after termination, on the grounds that RML has purportedly breached provisions in the lease unrelated to the termination provision. According to [Quality], RML's alleged breaches – which are the subject of cross-claims between the parties in a separate pending action in this Court – constitute the failure of an unexpressed and unwritten condition precedent to RML's right to terminate the lease without cause that bar RML from enforcing its termination right. RML seeks by way of this Cross-Complaint a judgment declaring that [Quality]'s interpretation of the lease and the law is erroneous as a matter of law, that RML has properly exercised its right to terminate the parties' lease and performed all required conditions precedent thereto, and that the lease is terminated and [Quality] has no legal or other right to remain on RML's property."

RML requested a judicial declaration that it properly terminated the Lease in accordance with its terms, the Lease was in fact terminated, and Quality must remove all of its equipment and vacate the Property at the end of the six-month notice period. It further sought to recover attorneys' fees and costs.

E. *RML's Motion for Summary Judgment in the Declaratory Relief Action*

In November 2023, RML filed a motion for summary judgment in the declaratory relief action on Quality's complaint, RML's cross-complaint against Quality, and each of Quality's affirmative defenses asserted in response to RML's cross-complaint. RML argued that it satisfied the only conditions precedent required for it to terminate the Lease: it deposited the $2.25 million termination fee into an escrow account and provided the irrevocable escrow instructions specified in the Lease. Anticipating Quality's

6

counterarguments, RML further argued there were no conditions precedent to its termination of the Lease in the original agreement.

Quality opposed RML's motion, contending that RML had not complied with its contractual conditions precedent to its right to terminate the Lease and that its history of bad faith, fraudulent, and illegal conduct supported Quality's affirmative defenses of unclean hands and setoff, precluding summary judgment for RML. Quality argued that RML was not permitted to enforce any covenant in the Lease until it performed all conditions precedent to Quality's duty to perform. Because RML had not done so, Quality asserted, RML's cause of action was barred and it could not obtain relief.

Specifically, Quality argued that section 13 of the Lease "unambiguously creates a set of conditions precedent to Quality's duty to 'comply with the terms of' the Lease; not just a few terms, or specific terms— all of 'the terms' of the Lease." According to Quality, the three conditions precedent RML had not fulfilled, which precluded it from terminating the Lease, were: (1) providing Quality with "the exclusive right and ability . . . to commence mining operations, on the Property . . . with no unreasonable restrictions"; (2) ensuring that "all warranties and representations set forth herein [were] true and correct"; and (3) ensuring that "no action, suit, or proceeding before any court or any government body or authority, pertaining to the activities contemplated by this agreement . . . [had] been instituted or threatened." Further, Quality asserted that although section 13 set forth a condition precedent requiring that all of RML's warranties and representations remain true throughout the term of the Lease, two representations did not remain true, and RML thus failed to satisfy that particular condition precedent. The two representations Quality argued were material to its opposition to RML's summary judgment motion and had not

7

remained true throughout the term of the Lease were: (1) "there are no existing or outstanding contracts[,] . . . agreements, obligations[,] . . . or restrictions that preclude" RML from "granting Quality the exclusive right to conduct mining operations on the Property"; and (2) "there are no existing or outstanding contracts[,] . . . agreements, obligations[,] . . . or restrictions . . . that may preclude Quality from its exclusive use of the Property."

In reply, RML reiterated that it was undisputed it deposited the $2.25 million termination fee into an escrow account accessible only by Quality, with irrevocable escrow instructions, and had given Quality notice per the Amendment. RML contended that nothing further was required to effect the termination of the Lease. RML argued that when the parties executed the Amendment, which stated in part that "[e]xcept as modified herein, the Agreement shall remain in full force and effect," the only conditions precedent RML had to fulfill to exercise its newly created termination right were those stated expressly in the Amendment. RML further contended that Quality's interpretation of section 13 as creating a set of conditions precedent to Quality's duties would compel the conclusion that Quality's duties would not even arise until the 99-year term of the Lease was over—an absurd result, RML asserted. It also emphasized that conditions precedent are generally disfavored, and Quality's "continuing condition precedent" concept was unsupported by the law. RML argued that the "very notion of a 'continuing condition precedent' is a misnomer because, as a matter of law, a condition precedent is an act or event that must occur before a counter-party's duty to perform is triggered. Conditions precedent do not, and cannot, operate on a continuum. They either occur or do not, and have whatever attendant consequences that the parties provided in their agreement."

8

Regarding Quality's affirmative defenses, RML asserted that each defense was without merit. It argued that Quality's setoff defense failed because (1) there were no cross-demands for money in the lawsuit, as required to apply the doctrine, (2) Quality cannot set off its damages claims with its own funds, (3) setoff cannot be asserted to obtain affirmative relief, and (4) Quality's argument failed to acknowledge RML's pending claim for damages in the other lawsuit between the parties. RML argued that Quality's unclean hands defense failed on each prong because (1) Quality did not present analogous case law, (2) RML's alleged misconduct did not amount to fraud or unconscionable conduct, and (3) Quality did not establish the requisite close relationship between RML's alleged misconduct and Quality's asserted injuries resulting from RML's termination of the Lease.

RML also filed evidentiary objections to two declarations Quality filed in support of its opposition to RML's summary judgment motion, as well as some of the additional facts it submitted in support of its opposition.

F. *Summary Judgment Hearing and Order Granting Summary Judgment*

Before the hearing on the summary judgment motion, the judicial referee—who had been appointed by stipulation to oversee and decide both the declaratory relief action and the damages action—issued a tentative ruling in RML's favor. During the hearing, the referee stated that although he had originally written up the tentative decision in favor of Quality, he changed his mind because he determined that "the amendment to the lease, which was written two years after the lease, is clear and unambiguous that there are only two conditions precedent to terminating the lease, and that's the payment of the money and the notice. And to the extent that I am interpreting the entire agreement as one agreement with the lease and the amendment as one, I still believe that under -- under the law, under a fair

9

reading of the terms of the contract, that Riverside Mining has performed the only two conditions precedent; and, therefore, they're entitled to judgment."

In February 2024, the judicial referee issued an order affirming its tentative ruling and granting summary judgment in favor of RML. In sum, the referee found that "the language of the amendment to the lease is clear and unambiguous and demonstrates that the parties agreed that Riverside Mining could terminate the lease at any time by depositing the funds and giving Quality Aggregates notice. Because Riverside Mining has performed those two conditions, it is entitled to judgment at this stage."

Specifically, the judicial referee found that even if it accepted Quality's argument that the parties had agreed in section 13 of the Lease that Quality's performance was conditioned on RML's performance of a number of conditions precedent, those alleged conditions precedent did "not apply to the termination clause in the amendment because the parties specifically agreed that there were only two conditions precedent to that provision. And the amendment was executed after the lease."

The referee further found that Quality's additional defenses of unclean hands and setoff were without merit. First, he found that even if RML violated the Lease and interfered with Quality's ability to mine the property unimpeded, these acts did not rise to the level of unconscionable conduct such that RML was barred from obtaining declaratory relief; moreover, the unclean hands arguments was "better suited for the damages actions" between the parties. Second, the referee found that Quality's setoff defense was also an argument better suited for the damages action, where it would be entitled to recover damages for RML's alleged breach of the Lease if it could prove at trial in that action that RML improperly received rent payments

10

from third parties for leasing portions of the Property that RML had already leased to Quality.

The trial court entered judgment in favor of RML on the declaratory relief action in April 2024. The judgment dismissed Quality's complaint with prejudice, ordered the Lease terminated effective immediately, ordered Quality to vacate and remove all of its equipment from the Property no later than August 18, 2024, and deemed RML the prevailing party entitled to costs and reasonable attorneys' fees in an amount to be determined at a later date.

## DISCUSSION

Quality contends that the trial court's judgment on the order granting summary judgment was in error and should be reversed because: (1) the Lease contains conditions precedent to Quality's duty to perform—in addition to the conditions specified in the Amendment—that have not been fulfilled by RML; and (2) there are triable issues of fact as to Quality's affirmative defenses of condition precedent, setoff, and unclean hands that preclude summary judgment.

We review an order granting summary judgment de novo. (*Ryan v. Real Estate of Pacific, Inc.* (2019) 32 Cal.App.5th 637, 642, citing *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.)

## I

The first question we must answer is whether the Lease contains any conditions precedent other than the two indisputably found in the Amendment. Quality asserts that section 13 of the Lease sets forth certain conditions—including that RML must provide Quality with the unencumbered and unimpeded right and ability to mine the Property—that it refers to as "continuing conditions precedent," that RML was required to comply with before Quality was required to perform any of its duties under

11

the Lease. Quality thus argues that RML was not entitled to exercise its termination right in the Amendment because it failed to comply with all conditions precedent in the Lease.

A "condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313 (*Platt Pacific*); see also Civ. Code, § 1436 ["A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed."].) Conditions precedent are disfavored, and courts will " 'not construe a term of the contract so as to establish a condition precedent absent plain and unambiguous contract language to that effect.' " (*Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172, 1183; see also *JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 594 (*JMR Construction*) [conditions precedent are not favored by the law]; (*Rubin v. Fuchs* (1969) 1 Cal.3d 50, 53–54 (*Rubin*) [same; "whenever possible the courts will construe promises in a bilateral contract as mutually dependent and concurrent"].)

Whether a condition precedent exists depends on the intent of the parties, which is generally determined by the words used in the contract. (*JMR Construction, supra*, 243 Cal.App.4th at p. 594.) We thus turn to the relevant language in the Lease.

Section 13 of the Lease is titled "Conditions to Quality Aggregates Obligation." The full text is as follows: "[Quality]'s obligation to execute this agreement and to comply with the terms of this agreement is subject to the satisfaction as of the Execution Date and throughout the term of this agreement of the following conditions and any other conditions contained in

12

this agreement.  ('Execution Date' shall be the date upon which this agreement is executed by the affixing of the signatures of the parties.)  RML shall use commercially reasonable efforts to cause these conditions to be satisfied as of the Execution Date and throughout the term of this agreement; and [¶] a. all warranties and representations set forth herein being true and correct; and [¶] b. RML has not entered into any operating leases or otherwise granted the right to conduct mining operations to any other party with regard to the properties and other mineral properties described in the recitals of this agreement.  [Quality] shall have the exclusive right and ability, at its sole option, to as soon as it shall determine such to be practical, to commence mining operations, on the property and on the other mineral properties, when acquired, in compliance with all governmental mining regulations with no unreasonable restrictions; and [¶] c. no action, suit, or proceeding before any court or any governmental body or authority, pertaining to the activities contemplated by this agreement or to its Execution, shall have been instituted or threatened; and [¶] d. the parties agree that unless otherwise agreed between the parties, that there shall be a minimum baseline sale price ('baseline sale price') of [¶] i. Riprap @ $10 per ton [¶] ii. Small aggregates @ $4 per ton [¶] e. [Quality] shall not sell material below baseline sale price to one party after which that party sells such material for additional profit shared with [Quality]; and [¶] f. [Quality] may import material from off site, to be blended with mined material to produce additional product lines such as Stabilizer and washed sand to manufacture Con/Mix; and [¶] g. the parties agree that large dirt importation requirements will be discussed and agreed upon before hand between the parties; and [¶] h. [Quality] shall not process any other material on the site and shall not import material from off site specifically for the purposes of

13

'recycling'; and [¶] i. the parties agree that [Quality] shall pay annual fees required to maintain the good standing of MSHA, OSHA and Riverside County agencies; and [¶] j. the parties agree that upon approval of the required permitting, that an Asphalt Plant may be installed on the site subject to Agreement between the parties as to the monthly lease structure and material pricing structure."

As an initial matter, we agree with the comments in the record from the judicial referee and RML that the Lease, and particularly section 13, is not a model of clarity. The judicial referee commented at the summary judgment hearing that the contract "wasn't written very well." He continued: "You know, I spent hours trying to understand what the parties were agreeing to and I don't think, for one second, that they understood that when in Paragraph 13 they said that Quality Aggregates' performance was subject to Riverside Mining['s] performing all of the terms essentially in Paragraph 13, but arguably in the whole contract, I don't think they understood that." Counsel for RML agreed that "section 13 is confusing, at best."

Quality disputes this, contending that the parties' use of the words "conditions" and "subject to" in section 13 unambiguously compels the conclusion that the parties intended these previsions to be conditions precedent. Section 13 sets forth 10 different subsections labeled as "conditions" to Quality's obligation to comply with the terms of the Lease, but Quality focuses on the two subsections it asserts are "most relevant" to the appeal: (1) Quality "shall have the exclusive right and ability, at its sole option, as soon as it shall determine such to be practical, to commence mining operations, on the property . . . with no unreasonable restrictions" (§ 13(b)); and (2) "all warranties and representations set forth herein [are] true and correct" (§ 13(a)). Quality argues that section 13 requires all of RML's

14

warranties and representations to remain true throughout the term of the Lease, including the following two representations found in section 14: (1) "there are no existing or outstanding contracts[,] . . . agreements, obligations[,] . . . or restrictions that preclude" RML from "granting Quality the exclusive right to conduct mining operations on the Property"; and (2) "there are no existing or outstanding contracts[,] . . . agreements, obligations[,] . . . or restrictions . . . that may preclude Quality from its exclusive use of the Property."

Quality contends that because its duties were all "subject to" the performance of these certain conditions, those conditions are "by definition" condition precedents, and there is "no other reasonable way to interpret" the Lease. Quality further argues that because these obligations of RML's were conditions precedent, it had "no duty to perform *whatsoever* unless and until R[ML] h[eld] up its end of the bargain" in all respects.

We are not persuaded. First, nowhere in section 13, or anywhere else in the original Lease, does the phrase "condition precedent" appear.[1] Instead, the parties' obligations are variably referred to as "conditions," "covenants," "warranties," "promises," "representations," and items to which the parties "agree." By way of contrast, the Amendment explicitly refers to "conditions precedent" when setting forth the conditions for RML's right to terminate the Lease.

---

[1] Quality also sometimes refers to subsections 13(a) and 13(b) as "continuing conditions precedent." We have found no case law supporting such a concept. This is unsurprising, as the idea runs counter to the definition of a condition precedent, which is some act or circumstance that must occur "*before* . . . the contractual duty arises." (*Platt Pacific, supra*, 6 Cal.4th at pp. 313–314, italics added; see also Civ. Code, § 1436.)

15

We acknowledge that the term "subject to" in a contract is "generally construed to impose a condition precedent" (*Rubin, supra*, 1 Cal.3d at p. 54), and section 13 of the Lease provides that Quality's obligations are "*subject to* the satisfaction . . . *of the following conditions . . . .*" (Italics added.) But "generally" does not mean "always," and we do not believe this is one of those general cases.

The main problem we see with Quality's suggested reading of the Lease is that even though section 13 purports to set forth "Conditions to Quality Aggregates['s] Obligations," it lists several conditions that *Quality*, not RML, is required to satisfy, including selling material at or above a certain baseline sale price, not processing other material on the site, not importing material for the purposes of recycling, and paying annual fees to certain agencies, among others. Section 13 also calls on the parties to agree in advance on certain items, such as large dirt importation requirements. As RML points out, under Quality's interpretation, some subsections of section 13 would be read as setting forth conditions precedent, but other subsections would be read as setting forth mere covenants. The law does not permit Quality to pick and choose which of these subsections are interpreted as conditions precedent and which are not—they *all* follow the language stating that Quality's obligation to comply with the terms of the agreement is "subject to . . . the following conditions."

Accordingly, if we were to accept Quality's argument that where a duty is "subject to" the performance of a condition, that condition is by definition a condition precedent, we must necessarily find that *each* of the subsections in section 13 is also a condition precedent. The result would require us to interpret the Lease to mean that if Quality imported materials from offsite for the purposes of recycling (section 13(h)) or failed to pay its required

16

annual fees (section 13(i)), its own actions in doing so would excuse it from performing under the Lease. This cannot have been the parties' intent. We must avoid contractual interpretations such as this that would "create absurd or unreasonable results." (*Sequeira v. Lincoln National Life Ins. Co.* (2015) 239 Cal.App.4th 1438, 1445; see also Civ. Code, § 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."].) We therefore conclude that Quality's reading of section 13 is not reasonable in light of the language used.

Given that the language in the original agreement is ambiguous at best, the language regarding conditions precedent in the Amendment is clear, and the law tends to disfavor conditions precedent, we conclude that the most reasonable interpretation of the Lease is that it does not impose conditions precedent on RML with respect to termination other than the two expressly stated in the Amendment. The trial court thus correctly found that RML had complied with the only conditions precedent required to effect the termination of the Lease.

Our analysis does not end here, however. We must still determine whether the trial court erred in granting summary judgment in light of Quality's affirmative defenses.

## II

A. *Standard of Review Applicable to Quality's Affirmative Defenses*

As an initial matter, the parties disagree regarding which standard of review applies to Quality's affirmative defenses. Quality contends our review is de novo, while RML argues we must apply an abuse of discretion standard. We agree with Quality. Where a trial court's ruling on an equitable defense is the basis for an order granting summary judgment, we independently review the ruling. (See *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61,

17

67–68 (*Johnson*) [concluding Court of Appeal erred in reviewing trial court's finding of laches, which was the basis for its order granting summary judgment motion, under an abuse of discretion standard].)

RML's arguments to the contrary are unconvincing. In arguing that the setoff defense must be reviewed for abuse of discretion, RML relies on a case where the appellate court reviewed the trial court's ruling denying an offset after trial—not an order granting summary judgment on setoff as an affirmative defense. (See *David S. Karton, a Law Corp. v. Musick, Peeler Garrett LLP* (2022) 83 Cal.App.5th 1027, 1040 (*David S. Karton*).) The case is therefore inapposite.

As to unclean hands, RML asserts that under *Padideh v. Moradi* (2023) 89 Cal.App.5th 418 (*Padideh*), the trial court's determination of some elements of this defense must be reviewed for abuse of discretion. This is incorrect. In *Padideh*, the plaintiff argued there was insufficient evidence to support the jury's unclean hands finding, and the court there concluded that it had to review certain elements of the unclean hands defense for substantial evidence, not abuse of discretion. (*Id*. at p. 438.) In any event, the *Padideh* court, like the *David S. Karton* court, was reviewing an appeal from an order issued *after trial*, not from an order granting summary judgment. (*Ibid*.) It is therefore also inapposite. As the Supreme Court has instructed, our review of the trial court's ruling on an equitable defense such as unclean hands at the summary judgment stage is de novo. (*Johnson, supra*, 24 Cal.4th at pp. 67–68.)

B. *Quality's Affirmative Defense of Condition Precedent*

Quality contends that the trial court erred in granting summary judgment as to its condition precedent affirmative defense, because regardless of whether there were additional conditions precedent in section

18

13, a party in material breach of any provision cannot enforce the contract. Quality argues that it has at least shown a triable issue of fact as to whether RML materially breached the Lease and Quality was thus excused from performing.

Quality did not present this argument to the trial court in opposition to RML's summary judgment motion. Instead, it characterized its condition precedent affirmative defense argument as duplicative of its argument regarding whether section 13 contained conditions precedent rather than covenants. We decline to consider this argument raised for the first time on appeal. (*Natkin v. Cal. Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1011 [appellate courts generally ignore arguments not presented and litigated in the trial court].)

C. *Quality's Affirmative Defense of Setoff*

Quality also contends that the equitable doctrine of setoff is applicable here and that it is entitled to a trial on the merits of this defense. It argues the setoff doctrine requires RML to fulfill all its monetary obligations under the Lease before RML can enforce the termination clause and Quality can be considered to have received the $2.25 million termination payment. We disagree.

"The right to a setoff is based on the equitable principle that when parties in litigation hold cross-demands for money, one demand should be applied against the other and the plaintiff may recover the balance due, if any." (*Morris Cerullo World Evangelism v. Newport Harbor Offices & Marina, LLC* (2021) 67 Cal.App.5th 1149, 1159; see also *Keith G. v. Suzanne H.* (1998) 62 Cal.App.4th 853, 860–861 [setoff " 'is a means by which a debtor may satisfy in whole or in part a judgment or claim held against him out of a judgment or claim which he has subsequently acquired against his

19

judgment creditor' "].)  The doctrine is also partially "codified as section 431.70 of the Code of Civil Procedure, which provides in pertinent part: 'Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated for so far as they equal each other[].' " (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744.)  A setoff occurs at the end of litigation and, generally speaking, " 'simply eliminates a superfluous exchange of money between the parties.' " (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 500 (*Los Angeles Unified*).)

Quality alleges in its answer to RML's declaratory relief cross-complaint that it "is entitled to offset and recoup against any judgment that may be entered against it all obligations of [RML] owing to" Quality.  But as RML points out, it did not seek any monetary judgment against Quality in this action.  Rather, it sought a declaration that it had complied with the two conditions precedent in the Amendment, allowing it to terminate the Lease. There was therefore never any possibility for a money judgment against which Quality could offset any amounts owed to it.  In other words, there could be no " 'superfluous exchange of money between the parties' " at the end of this litigation that needed to be eliminated.  (*Los Angeles Unified, supra,* 57 Cal.App.5th at p. 500.)  We therefore agree with RML that the setoff doctrine is not applicable here, and the trial court correctly granted summary judgment to RML on this affirmative defense.

D. *Unclean Hands*

Finally, we turn to Quality's contention that it has demonstrated that there are triable issues of material fact as to its affirmative defense of unclean hands, and the judgment must therefore be reversed on that basis.

The unclean hands doctrine demands that a litigant act fairly in the matter for which they seek a remedy. (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).) The doctrine "is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the [claimant] should not recover, regardless of the merits of his claim. It is available to protect the court from having its powers used to bring about an inequitable result in the litigation before it." (*Id.* at p. 985.) It promotes justice by making a plaintiff answer for their own misconduct in the action and "prevents 'a wrongdoer from enjoying the fruits of [their] transgression.' " (*Id.* at p. 978.)

Courts generally "apply a 'three-pronged test to determine the effect to be given to the plaintiff's unclean-hands conduct. Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries.' " (*Padideh, supra*, 89 Cal.App.5th at p. 426.) RML argues that Quality failed to demonstrate the existence of any of the three required elements. We address each prong in turn.

1. *Prong One: Analogous Case Law*

We first consider whether there is analogous case law establishing that the unclean hands doctrine is a defense to a declaratory relief action. We find that there is. In affirming the trial court's ruling in *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58, the Court of Appeal stated that the trial court's "unclean hands finding pertains to the substance of the

21

complaint and provided a complete defense to the declaratory relief cause of action." In *MacDonald v. Midland Mining Co.* (1956) 139 Cal.App.2d 304, 313, the court concluded: "The record also supports the findings of the [trial] court that the notice of location made by Neubert on behalf of appellant was made in bad faith and that appellant was not before the court with clean hands. In view of the fact that an action for declaratory relief is an equitable action, these findings alone would be sufficient to support the denial of any relief to appellant."

RML presents no authority to the contrary. We therefore conclude that Quality has met the first prong of the unclean hands test.

2. *Prong Two: The Nature of the Misconduct*

The second prong of the test requires us to examine the nature of the alleged misconduct. Though "[n]ot every wrongful act constitutes unclean hands . . . the misconduct need not be a crime or an actionable tort. Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine." (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979.)

Quality argues that RML "trespassed upon Quality's leasehold, deprived Quality of the majority of the property it is entitled to, and wrongfully leased that property to third parties for its own economic gain." According to Quality, this conduct constitutes contractual breaches, a civil tort, and criminal trespass.

RML's response is that we should reject Quality's argument because (1) the trial court's determination here is properly reviewed for abuse of discretion, and Quality failed to show such an abuse, and (2) Quality's assertions in support of the second prong are conclusory. As to the former, we have already rejected RML's contention. (See Section II.A, *ante*.)

22

As to the latter, we are unconvinced. Quality submitted documents, declarations, and deposition testimony in support of its claim that, among other things, RML: entered into agreements with multiple third parties to lease portions of the Property that were already leased to Quality; buried a large portion of Quality's leasehold in crushed construction debris and then allowed the new third-party tenants to park trucks, trailers, and storage containers on Quality's leasehold, thus preventing from Quality from mining areas containing significant rock reserves, depriving it of valuable operational areas for activities such as material storage and equipment maintenance, impacting the safety of its operations, and forcing it to move its operations to other parts of the Property, which increased operational costs significantly; attempted to charge Quality $67,191.30 for its use of certain portions of the Property despite those portions already being part of Quality's leasehold under the Agreement; and violated local zoning codes.[2] These are not conclusory statements. Rather, they are specific allegations supported at

_____

[2] RML mentions in a footnote that it objected to much of Quality's evidence in support of its opposition to the summary judgment motion at the trial court level. The judicial referee, however, did not rule on the objections. The Supreme Court has held that "if the trial court fails to rule expressly on specific evidentiary objections, it is presumed that the objections have been overruled, the trial court considered the evidence in ruling on the merits of the summary judgment motion, and the objections are preserved on appeal." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 (*Reid*).) Since *Reid*, the Legislature has amended Code of Civil Procedure section 437c to provide that the trial "court need rule only on those objections to evidence that it deems material to its disposition of the motion. Objections to evidence that are not ruled on for purposes of the motion shall be preserved for appellate review." (Code Civ. Proc., § 437c, subd. (q); see 2015 stats., ch. 161, § 1.) RML's objections were thus preserved, but it did not argue its objections on appeal or even request that we address them. We therefore decline to do so. (See *Reid*, at pp. 534–535.)

23

least in part by evidence tending to show that RML's conduct violated conscience, good faith, or other equitable standards of conduct. (See *Padideh, supra*, 89 Cal.App.4th at pp. 444–445 [substantial evidence of "lack of candor" in plaintiff's deposition testimony was sufficient to support jury's finding of unclean hands].) RML points to no evidence rebutting these points.

The question before us is not whether Quality has conclusively proven RML's misconduct, but rather whether it has made a showing of the existence of a triable issue of material fact as to RML's misconduct. We conclude based on the above facts that it has.

3. *Prong Three: The Relationship Between the Misconduct and the Claim*

The third prong of the test looks at the relationship between RML's alleged misconduct and its claimed injuries to determine whether it would be unfair to allow RML to recover on its claim. (*Padideh, supra*, 89 Cal.App.4th at pp. 446–447.) "The misconduct that brings the unclean hands doctrine into play must relate directly to the transaction concerning which the complaint is made. It must infect the cause of action involved and affect the equitable relations between the litigants." (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 984.) The purpose of this requirement "is to rule out application of the unclean-hands defense when the plaintiff is 'merely guilty of unrelated improper past conduct.' " (*Padideh*, at p. 448.)

Quality contends it raised a triable issue as to the third prong because it submitted evidence showing RML obtained the funds necessary for the Lease termination it seeks to enforce through this lawsuit by engaging in the complained-of misconduct—committing a breach of contract and tort against Quality and violating local zoning codes. In its opposition to the summary judgment motion, Quality argued that RML "was practically (if not actually) insolvent prior to its invasion of Quality's leasehold for the purpose of

24

wrongfully leasing the same property twice." Quality further argued that by wrongfully commandeering Quality's right to possession of the portions of the Property it was leasing, RML was able to raise millions of dollars in revenue. RML then used those ill-gotten profits to attempt to terminate the Lease by depositing the $2.25 million termination fee into an escrow account. Quality points to the declaration of its owner Dave Beck in support of its argument that RML used misappropriated funds to effect the termination of the Lease.

RML contends that Quality failed to demonstrate any connection between RML's alleged misconduct and the remedy it seeks in this action—a declaration that it properly terminated the Lease. It further argues that Quality's assertion that RML raised millions of dollars by leasing portions of the Property that were already leased to Quality is mere speculation. According to RML, Quality's arguments regarding the third prong amount to mere venting, or an effort to distort the case "into a proceeding to try the general morals of the parties." (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979.)

We believe Quality has the better argument here. RML urges us to "take[] an unreasonably narrow view of the unclean hands doctrine," and we decline to do so. (See *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 621 (*Unilogic*); *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 681 (*Peregrine Funding*) [concluding that plaintiff's "overly narrow formulation" of the doctrine was not supported by case law, and "[t]he question is whether the unclean conduct relates directly 'to the *transaction* concerning which the complaint is made,' i.e., to the '*subject matter* involved' [citation], and not whether it is part of the basis upon which liability is being asserted"]; *Kendall-Jackson,*

25

*supra*, 76 Cal.App.4th at p. 985 [rejecting "narrow" application of the doctrine when analyzing the relationship of the misconduct to claimed injuries].)

*Unilogic* is instructive. There, plaintiff Unilogic challenged the trial court's allowance of defendant Burroughs's unclean hands defense to Unilogic's action for conversion. (*Unilogic, supra*, 10 Cal.App.4th at p. 616.) Unilogic argued that its conversion claim, which related to the delivery of proprietary information by a Burroughs employee to Burroughs, was unrelated to Burroughs's unclean hands defense, which was based on Unilogic's payment of a bribe to that same employee, its failure to disclose its financial difficulties, its failure to return software, and its subsequent use of the software. (*Id.* at p. 621.) The Court of Appeal concluded that "Burroughs's conversion and Unilogic's misconduct occurred in the same transaction that forms the subject of this litigation—the joint development project." (*Ibid.*) This was "enough to trigger application of the unclean hands doctrine." (*Ibid.*)

Other courts have similarly concluded that the unclean hands doctrine is applicable where the misconduct and cause of action relate to the same "transaction." (See, e.g., *Padideh, supra*, 89 Cal.App.5th at p. 450 [third prong was met because the misconduct "occurred in a transaction or matter directly related to and infecting the one presently before the court, and [] it has affected the equitable relationship between the litigants"]; *Peregrine Funding, supra*, 133 Cal.App.4th at p. 681 [same]; *Kendall-Jackson, supra*, 76 Cal.App.4th at p. 987 [reversing trial court's order granting summary judgment in favor of claimant as to Kendall-Jackson's unclean hands defense; a "jury could find that [claimant]'s inequitable conduct occurred in the transaction related directly to the matter before the court"].) Here, too, a factfinder could find that RML's alleged inequitable conduct was related

directly to the "transaction that forms the subject of this litigation"—the termination of the Lease. (See *Unilogic, supra*, 10 Cal.App.4th at p. 621.)

We are unpersuaded by RML's argument that Quality merely seeks to litigate RML's "general morals." This case is unlike others where courts have found the misconduct insufficiently related to the transaction forming the subject of the litigation. Examples of such cases as set forth by the *Kendall-Jackson* court include *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 50, 52–53 (plaintiff's wrongful discharge of defendant was immaterial in a suit regarding defendant's misappropriation of plaintiff's trade secrets) and *Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 845, 851–852 (plaintiff's use of falsified immigration documents to obtain employment was not sufficiently related to her sexual harassment claim). (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 984.) Quality does not point to past, unrelated misconduct by RML. Rather, it contends that RML's misconduct—improperly excluding Quality from its leasehold and raising millions of dollars in revenue through its trespass and breach of the Lease—is the very reason RML was able to deposit the termination fee and effect its termination of the Lease, which it now seeks to enforce through this action. This is sufficient. (*Unilogic, supra*, 10 Cal.App.4th at p. 621.)

For all of the reasons above, we conclude that Quality has raised triable issues of material fact as to the application of the unclean hands doctrine to RML's claim, thus precluding summary judgment. We therefore reverse the judgment.

## DISPOSITION

The judgment is reversed and the matter is remanded with directions that the trial court vacate its order granting RML's motion for summary judgment, enter a new order denying summary judgment, and rule on RML's

27

alternative motion for summary adjudication in a manner consistent with this opinion. Quality Aggregates is entitled to its costs on appeal.


BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DO, J.